IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MIKE C. SOOK,

                Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.

Civil No. 06-1758-AS

FINDINGS AND
RECOMMENDATION

ASHMANSKAS, Magistrate Judge

Plaintiff Mike Sook ("Sook") challenges the Commissioner's decision denying his application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision should be reversed and remanded for further proceedings.

Sook was born February 9, 1959. He completed high school and received additional training in sales, purchasing, business and computer skills. He worked as a purchasing agent for a hazelnut

1 - FINDINGS AND RECOMMENDATION

processing business.  He stopped working May 18, 2002, allegedly due to an undiagnosed medical condition that caused pain everywhere on his body and weakness in all muscle groups.  In 2005 Sook returned to work stocking shelves at a retail store 15 to 25 hours a week.  This work requires him to stand all the time, frequently lifting items weighing 5 to 10 pounds and placing them on shelves. Tr. 728, 730.[1]

Sook alleges he has been disabled at all times since May 18, 2002, due to pain, weakness and problems with memory. He asserts he is not able to move very well or stand for long and has difficulty using a computer, pen or pencil.  He believes pain medications adversely affect his reasoning.  Tr. 185, 189.

The ALJ applied the five-step disability determination process set forth in 20 C.F.R. § 404.1520.  See Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The ALJ resolved Sook's claim at the fifth step of that process, determining that Sook could not perform his past work, but retained the residual functional capacity ("RFC") to perform other work in the national economy.

A claimant's RFC is an assessment of the sustained work-related activities he can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96-8p.  The ALJ assessed Sook's RFC as follows:

> The claimant can lift and carry 10 pounds frequently and 20 pounds occasionally.  He can sit, stand and walk for up to 6-hours maximum in each activity (cumulatively, not continuously) in an 8-hour workday with normal breaks.  His push/pull exertional capacities, in his upper and lower extremities, are limited to the weight levels he can lift-and-carry, as set forth above.  In giving the claimant every

---

[1] "Tr." refers to the official transcript of the administrative record.  (Docket # 8).

benefit of doubt, I also find he is precluded from driving and operating a motor vehicle, solely because of his narcotic pain medication, Kadian.

The claimant's postural non-exertional limitations are that he can climb stairs, equivalent ramps, along with ropes, ladders and scaffolding, no more than occasionally. He can do occasional to frequent bending, balancing stooping, kneeling, crouching and crawling. His vocational non-exertional limitation is that he is limited to no more than simple, routine, repetitive type work. Lastly, I find he has no other exertional or non-exertional limitations.

Tr. 35.

The ALJ received testimony from a vocational expert ("VE") who identified examples of work in the national economy that could be performed by a hypothetical person with Sook's age, education, work experience and RFC. The ALJ concluded that Sook was not disabled within the meaning of the Social Security Act.

## **STANDARD OF REVIEW**

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

If substantial evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. Batson v. Commissioner of Social Security, 359 F.3d 1190, 1193 (9th Cir. 2004). The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## DISCUSSION

Sook contends the ALJ failed to assess his RFC accurately and relied on inadequate vocational testimony in reaching his decision.

### I.    Evaluation of Sook's RFC

Sook contends the ALJ reached an inaccurate RFC assessment because he improperly discredited Sook's testimony, rejected the opinion of Marilyn Booth, M.D., and omitted a finding by a state agency medical consultant that Sook has limited ability to reach overhead.

#### A.    Sook's Testimony

Sook's testimony is summarized in the following paragraphs. He worked for over 20 years at a small company that processed hazelnuts. He had many responsibilities including purchasing agent, truck dispatcher, truck and forklift driver, shift supervisor, packaging supervisor and safety supervisor. Tr. 734-36.

In 1999, Sook began to feel pain and weakness in his legs. In 2000, he began to reduce his work responsibilities due to weakness and pain in his whole body. He stopped driving trucks and forklifts because he became too weak to depress the pedals or pull straps and ropes to secure loads. By 2002, most of his duties had been transferred to other people and he missed a lot of work from pain and sickness. Tr. 742-44. His cognitive abilities declined and he became unable to write contracts or remember telephone conversations. Tr. 742-44. His difficulties progressed until he felt unable to do his job and stopped working in May 2002.

Sook has constant pain and weakness made worse by walking, climbing stairs, vacuuming, sweeping, doing dishes and washing clothes. His symptoms are lessened by lying down, sleeping and taking an extended release morphine sulphate medication called Kadian. Tr. 747-49.

Sook's current daily activities are limited to his part-time work, sleeping and watching television. He typically works from 6:00 to 11:00 in the morning and goes back to bed after work. He gets out of bed at dinner time and watches television until he goes back to bed. Tr. 729, 745-47. He can walk up to 4 blocks in a day and stand for about 10 minutes at a time. He does not drive because he is too weak to push the pedals and cannot concentrate well enough to drive safely. He cannot sit still for long periods. He tries not to lift more than 20 pounds at a time. He has a weak grip and cannot hold a gallon of milk without dropping it. He tries not to reach away from his body. Tr. 746, 750, 752-55.

The ALJ found Sook's subjective description of his limitations not fully credible. He accepted Sook's assertion that he can no longer do heavy work and should lift and carry no more than 20 pounds occasionally. He accepted that climbing ramps or stairs and crouching, bending and other postural functions should be limited as described in his RFC assessment. The ALJ also accepted Sook's assertion that he should not operate a motor vehicle.

The ALJ did not believe Sook's assertion that constant pain and weakness leave him unable to perform any kind of work. He discredited Sook's assertions of limitations in excess of those described in his RFC assessment. These include the claims that he can stand no more than 5 to 10 minutes at a time, walk no more than 4 blocks in a day, not reach or stoop at all and not depress the pedals of a motor vehicle. Tr. 34.

An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ must make findings that are "sufficiently

specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).

In assessing a claimant's credibility, an ALJ may consider objective medical evidence and the claimant's treatment history. Smolen, 80 F.3d at 1284. An ALJ may consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. Id. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. Id. 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ considered proper factors and made specific findings sufficient to show that he did not reject Sook's testimony arbitrarily. He pointed out that the objective medical findings were minimal at best and did not support the presence of a medical condition that could reasonably be expected to cause the disabling symptoms Sook asserted.

When Sook complained of pain and weakness in 1999, his physicians evaluated him for neurological pathology. Diagnostic imaging showed a normal cervical spine and head. Myelogram studies of the thoracic and cervical spine produced no evidence of central disk herniation, canal stenosis or nerve root compression. Tr. 372-76.

In February 2000, microneurologist Oisin O'Neill, M.D., evaluated Sook for complaints of pain everywhere and fatigue with any activity. Although Sook reported difficulty walking and climbing stairs, Dr. O'Neill observed that he moved easily and had a normal gait. Dr. O'Neill's physical examination was entirely normal and MRI studies of the brain and cervical spine were

essentially normal.  Dr. O'Neill found no evidence of weakness, describing Sook's grip strength as "very strong" bilaterally.  Tr. 320-21.

In October 2000, rheumatologist James Smith, M.D., evaluated Sook for complaints of diffuse pain and weakness.  Sook appeared muscular and healthy.  Dr. Smith's general medical examination and peripheral joint examination were normal.  Sook had excellent strength in the shoulders and thighs.  A battery of laboratory tests were normal and numerous imaging studies revealed no evidence of spinal cord pathology.  Dr. Smith concluded, "my evaluation found no objective abnormality to explain his self-perception of weakness and impairment."  Tr. 422-23.

In January 2001, David Koeller, M.D., evaluated Sook to rule out a mitochondrial disorder or other metabolic disease.  Dr. Koeller obtained completely normal findings in his examination and found it unlikely Sook suffered from any metabolic disease.  Sook was preoccupied with whether he had familial amyotrophic lateral sclerosis ("ALS") which reportedly had afflicted some of his relatives, including his mother.  Tr. 331-32.  Laboratory tests confirmed that Sook did not have the marker gene associated with inherited ALS.  Tr. 420-30.

In September 2001, Christoper Ginocchio, M.D., evaluated Sook for possible motor neuron diseases such as ALS.  Dr. Ginochio obtained an essentially normal neuorological examination with no convincing evidence of any neuropathological process or motor neuron disease.  Extensive laboratory tests were negative for rheumatoid arthritis, polymyalgia rheumatica and polymyositis.  Dr. Ginocchio could not explain the etiology of Sook's subjective pain, weakness and fatigue.  Tr. 301-05.

In October 2001, Sook had another series of MRI studies showing a mild disk protrusion in the cervical spine without signal change.  Images of the thoracic and lumbar spine showed moderate

7 - FINDINGS AND RECOMMENDATION

scoliosis and mild degenerative changes, but no compression of the spinal cord or nerve roots. Tr. 480-83.

In November 2001, neurologist Sean Green, M.D., examined Sook and could not find any medical reason for Sook's subjective symptoms. Tr. 344. Dr. O'Neill opined that Sook's subjective symptoms were not consistent with central neurological dysfunction. Tr. 318-19.

Dr. Green obtained somatosensory evoked potentials ("SSEP") which showed normal signal conduction over the median nerve, but delayed conduction in the tibial nerves bilaterally. Tr. 345, 362-63. He obtained new MRI scans of the cervical and thoracic spine which were unchanged. Dr. Green noted that the disk protrusion in the cervical spine "could be symptomatic." The spinal cord had normal signal intensity, however. Tr. 377.

Reviewing these studies, Dr. O'Neill opined that they did not demonstrate radicular disease that would cause diffuse pain and weakness throughout the extremities as Sook described. He felt that Sook's symptoms were not attributable to ALS or to the evidence shown on the MRI studies. Tr. 316-17.

In January 2002, Sook was evaluated by Todd Dunaway, M.D., at a neuromuscular clinic. Sook's physical examination demonstrated full strength and muscle tone in all major muscle groups and a "completely normal neurological examination." Tr. 330.

Dr. Dunaway reviewed Sook's medical records, including the MRI studies, a CT scan of the cervical spine, electrocardiogram records, chest and shoulder x-rays, two sleep studies, electromyography with nerve conduction studies, and extensive laboratory evaluations. Tr. 327-30.

Dr. Dunaway did new studies and found the abnormal conduction in the tibial nerves had normalized. He opined that Sook's symptoms would have resolved over time if they had been

attributable to any condition associated with the abnormal conduction studies.  Instead, Sook reported progressively worsening symptoms. Dr. Dunaway was unable to determine the significance of Sook's subjective pain, but opined that it was neither a progressive neurological condition nor a motor neuron disease.  He suggested further evaluation by a rheumatologist or psychiatrist.  Tr. 330, 333.

In March 2002, Sook was evaluated by David Sibell, M.D., at a pain management clinic. Dr. Sibell obtained an essentially normal examination.  Sook's history convinced Dr. Sibell that neurological etiologies had been ruled out.  Sook denied depression.  Dr. Sibell was unable to reach any diagnosis to explain Sook's subjective symptoms.  Tr. 322-23.

Shortly after this in mid-May 2002 Sook's symptoms allegedly progressed to the point that he could no longer work.

In June 2002, Dr. Green suggested Sook's symptoms might result from the combined effect of a canal stenosis in the thoracic spine and myelopathy in the cervical spine.  He ordered new MRI scans and SSEP studies to evaluate this possibility.  Tr. 342-43.  The MRI studies were consistent with the earlier MRIs showing a small disk protrusion in the cervical spine, but no abnormal signal changes.  Tr. 359-60.

In August 2002, Dr. Green opined that Sook had probable mild myelopathy in the cervical spine and possible mild myelopathy in the thoracic spine.  He conceded, however, that there was "no evidence on examination of definitive myelopathy" and that the objective findings were improved compared with Sook's examination two months earlier.  Tr. 340.

In October 2002, Sandra Pinches, Ph.D., performed a psychological evaluation.  Sook claimed pain and weakness everywhere, loss of grip strength, and poor memory.  He denied

depression and difficulty following a sequence of instructions.  On the MMPI personality measure, Sook responded in a profile partially consistent with the profiles of people who have a somatization disorder.  Dr. Pinches explored this potential diagnosis during a post-test feedback session and found Sook's behavior and responses inconsistent with expectations for a person with a somatization disorder.  Tr. 387-88, 390-91.

Dr. Pinches opined that her evaluation did not rule out psychological factors contributing to a somatization pain syndrome, such as a psychogenic pain disorder, a general medical pain disorder or a combination of the two.  She did not reach this diagnosis, however.  Instead, Dr. Pinches diagnosed only an adjustment disorder with depression and assigned a global assessment of functioning score ("GAF") of 65, which indicates mild symptoms in a person generally functioning pretty well.   AMERICAN PSYCHIATRIC ASSOCIATION, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR) 32-34.  Tr. 391-92.

In October 2002, neurologist Catherine Ellison, M.D., examined Sook for complaints of grip strength loss and tingling in the left hand.  Dr. Ellison found Sook's grip strength completely normal.  Indeed, strength was normal and symmetric in all muscle groups, except at the ankles where Sook had experienced a past injury.  Tr. 439-40.

Dr. Ellison found diminished pinprick sensation at the 4th and 5th fingers of the left hand.  Another nerve conduction study of the left ulnar nerve showed abnormal conduction where the ulnar nerve passes over the left elbow.  Dr. Ellison found no abnormalities in the right ulnar nerve or the median nerves bilaterally.  She found no abnormality affecting the right foot, where Sook reported the greatest pain.  She found a very mild abnormality in the anterior tibial nerve which was not

enough to support myelopathy.  Tr. 522.  She opined that no physical diagnosis would explain Sook's underlying myalgias and recommended psychiatric counseling for coping skills. Tr. 439-40.

Meanwhile, at about the same time, Dr. Green submitted an opinion letter stating that degeneration in Sook's spine resulted in mild cord compression that would make manual labor difficult but would not preclude more sedentary work.  Tr. 339.

In March 2003, Sook underwent a neuropsychological evaluation by Michael Daniel, Ph.D., to evaluate a subjective decline in memory.  Dr. Daniel found generally average abilities across all cognitive areas, with occasional low average to borderline scores on problem solving memory tests. Dr. Daniel found Sook's pain behavior and subjective severe physical impairment disproportionate to the medical findings and said that a somatoform disorder should be considered.  Tr. 466-75.

Sook then underwent another series of MRI studies.  The disk protrusion in the cervical spine was less prominent than in earlier studies.  Images of the thoracic spine showed degenerative changes, but no areas of abnormal signal or disk protrusion.  Tr. 527-28.

Dr. Green and Dr. O'Neill exchanged letters describing contrary opinions. Dr. Green continued to pursue the theory that Sook's symptoms could result from an unusual multifocal myelopathy due to spinal cord compression and tethering at points in the cervical and thoracic spine. Tr. 478, 488.  Dr. O'Neill disagreed, pointing out that the newest images showed no profound compression that could tether the spinal cord at any level and no intrinsic change in signal that would result from such compression.  Dr. O'Neill opined that Sook's subjective symptoms did not make sense as myelopathy.   Tr. 571.

Dr. Green ultimately conceded that Sook's subjective complaints of pain were disproportionate to the objective findings. Tr. 478.  He could not explain the discrepancy between

11 - FINDINGS AND RECOMMENDATION

the mild myelopathic findings and Sook's complaints of severe impairment in gait and diffuse pain. Tr. 488. He also conceded that his multifocal myelopathy theory would not account for all of Sook's symptoms. Tr. 479, 489.

In summer 2003, serology laboratory studies of blood serum and cerebrospinal fluid were negative for markers associated with multiple sclerosis, amyloidotic polyneuropathy disorders and other potential conditions. Tr. 489, 493-501.

In July 2003, Sook underwent a physical capacities examination ("PCE") to determine whether he needed a motorized wheelchair to improve his mobility. He told the examiner he had difficulty being mobile in the community due to muscular weakness and fatigue resulting from a progressive neuromuscular disease. Sook demonstrated materials handling capacities at the light work category. His physical demand level was classified at the light work category for an 8-hour day. The test results and clinical observations led the examiner to conclude that Sook did not need a motorized wheelchair. Tr. 577-82.

In November 2003, Sook complained of shortness of breath and chest pain. Brian Kelly, M.D., described him as "an enigma" because he did not demonstrate abnormalities other than the subjective feeling that he was short of breath. Dr. Kelly opined that there was no evidence Sook had ventilatory problems because laboratory tests for blood gasses, particularly blood levels of carbon dioxide, were normal. Tr. 584.

From October 2003 to March 2004, John Ravits, M.D., attempted to evaluate Sook's complaints of progressive pain and weakness and anxiety over a possible association with ALS. Dr. Ravits reviewed the extensive medical records and concluded as follows: the MRI scans were essentially negative with the cervical views showing an ordinary degree of spondylosis and no

significant frank myelopathy; the EMG nerve conduction studies were essentially negative for neuromuscular abnormality; the SSEP studies were negative; the extensive laboratory tests were all negative; a  DNA test for spinal atrophy was negative; the tests for ALS marker genes were negative; and the neuropsychiatric evaluations did not support significant abnormality.  Tr. 515.

Dr. Ravits's clinical evaluation indicated that Sook's symptoms were atypical for most neuromuscular disorders.  He obtained essentially normal findings on his physical examination. Sook demonstrated good strength and had no signs of significant atrophy.  Dr. Ravits noted that Sook's diffuse pain syndrome was mostly subjective and he questioned physiological pathology. Tr. 555.

Dr. Ravits ordered a DNA test to rule out fascioscapulohumeral dystrophy, but these results were also negative.  Tr. 517.  He then did another wide array of EMG studies but obtained normal results.  He found no evidence of any abnormal neuromuscular function to explain Sook's chronic pain, myalgia and weakness.  Tr. 557-58.  Finally, in March 2004, Dr. Ravits ordered a muscle biopsy, which was also negative.  Dr. Ravits concluded, "Clinical exam, neurophysiological studies, laboratory testing and muscle biopsy are all within normal limits.  No objective diagnosis." Tr. 554.

The ALJ could reasonably conclude from this long treatment record that the minimal objective findings do not support the severe physical limitations Sook alleged in his testimony. Sook testified that he is so weak he cannot depress the pedals to drive an automobile or grip a gallon of milk.  These statements are refuted by the clinical findings of Drs. Ravits, Ellison, Dunaway, Smith and O'Neill, as well as the PCE.  All of these sources found Sook's strength essentially normal.

The ALJ relied on the testimony of the medical expert and the opinions of reviewing physicians in assessing Sook's credibility. The medical expert testified that the treatment records did not support any objective diagnosis that would explain Sook's symptoms. Tr. 697. He described Sook's condition as "an undiagnosed ailment with bizarre symptoms." Tr. 677. He felt the RFC assessment reached by the reviewing physicians was appropriate based on the medical evidence. Tr. 698. The ALJ's RFC assessment is essentially consistent with theirs, with one exception discussed more fully below.

Sook argues that the evaluation of Dr. Pinches provides objective medical support for his complaints of disabling pain. He believes Dr. Pinches's report confirms that he experiences either psychogenic or physical pain or both. In fact, Dr. Pinches opined only that her evaluation did not rule out psychological factors as a possible cause of Sook's pain.

Sook's MMPI response profile was partially consistent with the typical response profile presented by patients with a somatization disorder such as a psychogenic pain disorder. Sook's profile had an elevated depression score, however, which Dr. Pinches found inconsistent with a typical somatization profile. In addition, Dr. Pinches found Sook's responses and behavior during the post-MMPI session inconsistent with a person whose physical symptoms were primarily an expression of a somatization disorder. Moreover, Dr. Pinches did not diagnose a somatization disorder. Tr. 390-91.

Even if Dr. Pinches believed Sook was experiencing psychological factors causing pain, her opinion supports only mild symptoms, not the debilitating functional impairments Sook asserts. She assigned a GAF score of 65, which indicates a person who is experiencing "some mild symptoms . . .but generally functioning pretty well." DSM-IV 30-32. Tr. 392. Contrary to Sook's

argument, the ALJ did not ignore Dr. Pinches's findings. He discussed her evaluation in general and the MMPI scores in particular. Tr. 31. His interpretation of Dr. Pinches's evaluation is rational and consistent with the record as a whole.

The ALJ also found Sook's allegations of severe functional limitations inconsistent with his reported activities, including his part-time work. Sook testified he could not stand for more than 5 to 10 minutes at a time, but his part-time work required him to stand all the time, presumably several hours during a part-time shift. Sook testified he has difficulty reaching out from his body and gripping items. The ALJ found this inconsistent with his job duties of gripping objects and reaching out to place them on shelves.

Sook argues his part-time work does not demonstrate he is capable of working full-time on a regular and continuing basis. Despite this, the ALJ could reasonably find the part-time work undermines the credibility of Sook's statements regarding specific limitations in standing and reaching. As for Sook's ability to perform work on a full time basis, the ALJ relied on the PCE mentioned above, which predicted Sook's physical demand capacity in the light work category for an 8-hour day. Tr. 581.

Sook testified that his daily activities were limited to working, watching television and sleeping. In contrast, the activities he reported to medical providers were not as restricted. For example, he described fairly typical daily activities during a clinical interview with Joe Wood, Psy.D., including vacuuming, dishwashing, laundry, wiping down floors, cooking and socializing with visitors. Tr. 622.

In summary, the absence of objective medical findings, the opinions of numerous medical providers who found Sook's subjective complaints disproportionate to the medical findings, the

opinion of the medical expert, Sook's demonstrated ability to perform activities he claimed he could not do, and inconsistencies between his testimony regarding daily activities and his reports of activities to physicians provide a reasonable basis for the ALJ to conclude that Sook's allegations of limitations in excess of his RFC assessment are not entirely credible.  The ALJ's reasons are sufficiently specific to permit the court to conclude that the ALJ did not discredit Sook's statements arbitrarily.  The ALJ's credibility determination should be affirmed.

**B.    Treating Physician's Opinion**

Dr. Booth was Sook's primary care physician at all relevant times and referred Sook to the numerous specialists who evaluated his complaints.  In progress notes from an office visit in July 2005, Dr. Booth wrote, "I see no way he's employable at any job at this time or in the foreseeable future."  Tr. 647.  Sook contends the ALJ failed to provide adequate reasons for discounting this opinion.

Generally, a treating physician's medical opinion is given great weight in disability cases. Ramirez v. Shalala, 8 F.3d 1449, 1453 (9th Cir. 1993).  Dr. Booth's opinion that Sook was not employable is not a medical opinion, it is an administrative finding that the regulations reserve to the Commissioner.  Such an opinion cannot be given special significance, even when offered by a treating physician, but must be weighed by reviewing the evidence that supports the opinion.  20 C.F.R. § 404.1527(e)(1); SSR 96-5p.

The ALJ found Dr. Booth's statement unsupported by clinical findings, medical signs or documentation that could reasonably form a basis for concluding that Sook was not employable. Dr. Booth's progress notes recite that Sook is impaired by recurrent sleep apnea, restless leg syndrome and chronic pain, but she did not make findings of any specific functional limitation or

identify any work-related activity that he cannot perform. An ALJ can properly reject a physician's opinion that is conclusory and unsupported by clinical findings. <u>Meanal v. Apfel</u>, 172 F.3d 1111, 1112-13 (9th Cir. 1999). Dr. Booth's findings fall far short

As Sook recites in his brief, Dr. Booth's clinical findings included her observation of some apparent pain behavior with gait changes in July 2005, swelling in the left foot in August 2004, and several observations that he moved slowly and fidgeted during appointments. Tr. 546, 602, 609, 647, 652. Such meager findings fall far short of an informed opinion that Sook has impairments that would significantly interfere with his ability to do any work.

Sook argues that sleep studies and the PCE provided clinical findings to support Dr. Booth's opinion. The first two sleep studies showed normal oxygen saturation, very little clinically significant sleep apnea and moderate periodic limb movements that usually did not arouse Sook. Tr. 307, 309, 428.

In the third sleep study in February 2003, Sook demonstrated severely reduced sleep efficiency, moderately increased respiratory disturbances without significant oxygen desaturation, and moderately increased limb movements. Under treatment with a positive airway pressure device, Sook's sleep efficiency improved significantly and his limb movements declined. Sook reported that he felt the device worked for him. Tr. 528-31.

At most, the sleep studies establish that Sook has sleep apnea and a periodic limb movement disorder that appear to be corrected by treatment. They do not provide medical signs or clinical findings that support Dr. Booth's statement that Sook is not employable in any job.

Sook's reliance on the PCE from July 2003 also fails. As Sook states in his brief, the PCE examiner felt Sook's subjective reports were reliable. Nonetheless, the evaluation suggested that

Sook was capable of work at the light category.  Tr. 581.  Accordingly, it does not support Dr. Booth's statement that Sook is not employable in any job.

Based on the absence of clinical findings and medical signs, the ALJ could reasonably conclude that Dr. Booth based her statement primarily on Sook's subjective statements.  An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaints of disabling symptoms which the ALJ has properly discounted.  Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

In summary, the ALJ discounted Dr. Booth's statement because it was not supported by relevant medical signs or clinical findings and appeared to be inconsistent with the record as a whole.  20 C.F.R. § 404.1527(d)(3), (4).  The ALJ made findings setting forth specific, legitimate reasons supported by substantial evidence.  Thomas v. Barnhart, 278 F.3d 947, 956-57 (9th Cir. 2002) quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The ALJ's evaluation of Dr. Booth's statement should be affirmed.

### C.    Medical Consultant's Opinion

In August 2000, Sook complained of right shoulder pain.  An x-ray showed degenerative joint disease.  Sook had full range of motion with subjective pain at the extremes.  Dr. Booth diagnosed mild to moderate tendinitis.  Tr. 420-21.

On July 25, 2002, Charles Spray, M.D., reviewed Sook's medical records and prepared an RFC assessment for the state disability determination agency.  Dr. Spray did not provide treatment or examine Sook, but relied entirely on the medical evidence available.  Dr. Spray opined that Sook was "limited to occasional over the head reaching" based on the August 2000 x-ray.  Tr. 336.  On

December 2, 2002, Martin Kehrli, M.D., reviewed the medical evidence available at that time and affirmed Dr. Spray's RFC assessment, including the limitation on overhead reaching.  Tr. 462.

In April 2004, Sook reported primarily left shoulder pain radiating through the shoulder girdle.  Tr. 607.  David Buuck, M.D., found impingement signs.  An MRI study confirmed an impingement syndrome in the left AC joint.  Tr. 559-60, 563.  Sook initially opted to proceed with shoulder surgery and had a pre-operative evaluation with Dr. Buuck on June 2, 2004.  Tr. 561-62.  The case record does not indicate that the surgery was completed.

Sook contends the ALJ erred by failing to include the overhead reaching limitation found by Drs. Spray and Kehrli in his RFC assessment. The Commissioner relies on medical consultants such as Drs. Spray and Kehrli, to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose.  Such findings are held to strict standards and are given weight only to the extent they are supported by evidence in the record and consistent with the record as a whole.  The ALJ is not bound by the findings of reviewing consultants, but must explain the weight given to the opinions in their decision.  20 C.F.R. § 404.1527(f); SSR 96-6p.

In his decision, the ALJ indicated that "unless otherwise specified, [he gave] great weight to the medical opinions of the . . . non-examining medical consultants."  Tr. 23.  He then made no further mention of the opinion of Drs. Spray and Kehrli. Instead, the ALJ relied on the treatment records of Dr. Buuck and the testimony of the medical expert to assess the functional limitations imposed by Sook's shoulder impairment.  Tr. 28-30.

The medical expert testified that the surgical procedure Dr. Buuck proposed would require a recovery period of less than 12 months.  Tr. 697.  The ALJ concluded alternatively that either Sook's shoulder symptoms improved within 12 months or he underwent surgery and recovered

within 12 months.  The ALJ found the shoulder impairment severe but temporary, because it did not impose functional limitations for a period of 12 months.  Tr. 29.

The ALJ's alternative findings are not supported by substantial evidence.  Neither alternative accounts for the reaching limitation found by Drs. Spray and Kehrli.  The evidence supporting that opinion dates back to August 2000.  The ALJ did not explain why he excluded this period of time when calculating the duration of Sook's shoulder impairment.  The ALJ ignored treatment records from December 2004 suggesting that Sook had ongoing shoulder pain but could not afford treatment by the orthopedic surgeon.  Tr. 598.

The ALJ also neglected portions of the medical expert's testimony.  The medical expert testified that, discounting the temporary limitations associated with shoulder surgery, he believed the functional limitations from degenerative joint disease found by Drs. Spray and Kehrli were correct.  Tr. 698.

The Commissioner argues that the ALJ was entitled to rely on the 2003 PCE because it was more recent than the opinion of Drs. Spray and Kehrli.  The PCE appears to show that Sook demonstrated the ability to lift 25 pounds from shoulder to overhead.  Tr. 580.  The PCE examiner did not offer an opinion on Sook's overhead reaching ability however.  Accordingly, this court is unable to say that the PCE conflicts with Drs. Spray and Kehrli.  The Commissioner also argues that Sook's part-time work stocking shelves refutes Sook's testimony that he cannot reach at all.  This misses the point that Drs. Spray and Kehrli reached their conclusion based on objective medical evidence long before Sook testified.

In summary, the ALJ failed to explain the weight he attributed to the finding of the reviewing consultants.  His evaluation of the functional limitations attributable to Sook's shoulder impairment

is not supported by substantial evidence and should not be sustained. The court is unable to conclude that the RFC assessment he reached accurately reflected the functional limitations attributable to Sook's shoulder impairment. The ALJ's RFC assessment should be reversed.

## II.    **Vocational Evidence**

At step five, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner can satisfy this burden by eliciting testimony from a VE with a hypothetical question that sets forth all the limitations of the claimant. The assumptions in the hypothetical question must be supported by substantial evidence. Tackett v. Apfel, 180 F3d 1094, 1100 (9th Cir 1999).

Here, the ALJ elicited testimony from the VE with a hypothetical question that did not accurately reflect all of Sook's functional limitations. The hypothetical limitations were based on the ALJ's erroneous RFC assessment. Accordingly, the vocational testimony was insufficient to support the Commissioner's decision.

Sook challenges the vocational testimony on two other grounds that need not be resolved at this juncture.

## **RECOMMENDATION**

Based on the foregoing, the ALJ's RFC assessment is not supported by substantial evidence. The Commissioner's final decision should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to reassess the functional limitations associated with Sook's shoulder impairment, obtain vocational testimony based on an accurate RFC assessment and issue a new decision.

/ / / / /

## <u>SCHEDULING ORDER</u>

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due no later than **December 13, 2007**.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the objections are filed.  Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 28th day of November, 2007.

　　/s/　Donald C. Ashmanskas　　　　　　
　　　　DONALD C. ASHMANSKAS
　　　　United States Magistrate Judge